# APPEAL NO.: 23-13940-CC

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE,

v.

TOMARIO HICKS,
DEFENDANT-APPELLANT.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION
CASE NO.: 1:22-CR-00028-LAG-TQL-1

---

**Appellant's Reply Brief**

---

Jonathan Dodson
Assistant Federal Defender
Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel: (478) 743-4747
Fax: (478) 207-3419
E-mail: jonathan_dodson@fd.org
Appellate Counsel for Hicks

**Appellant's Certificate of Interested Persons and Corporate Disclosure Statement**

The undersigned appellate counsel of record for Appellant, Tomario Hicks, in compliance with Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, certifies that the following listed persons and parties have an interest in the outcome of this case:

**Conway, Byron L., Jr.**, Executive Director for the Federal Defenders of the Middle District of Georgia, Inc.;

**Dodson, Jonathan**, Appellate Attorney for Defendant-Appellant, Tomario Hicks, Assistant Federal Defender, Federal Defenders of the Middle District of Georgia, Inc.;

**Gabriel, Russell C.**, Former Interim Executive Director for the Federal Defenders of the Middle District of Georgia, Inc.;

**Gardner, Leslie Abrams**, District Court Judge, United States District Court, Middle District of Georgia;

**Granims, Michael**, Attorney for Defendant-Appellant, Tomario Hicks, Assistant Federal Defender, Federal Defenders of the Middle District of Georgia;

**Hicks, Tomario**, Defendant-Appellant;

**Langstaff, Thomas Q.**, United States Magistrate Judge, Middle District of Georgia;

**Leary, Peter D.**, United States Attorney, Middle District of Georgia;

**Redavid, Matthew, Jr.**, Assistant United States Attorney, Middle District of Georgia;

**Schieber, Michelle L.**, Assistant United States Attorney, Middle District of Georgia;

**Simpkins, Michael N.**, Attorney for Defendant-Appellant, Tomario Hicks, Assistant Federal Defender, Federal Defenders of the Middle District of Georgia, Inc.;

**Victims:** There are no identifiable victims in this case.; and,

No publicly traded company or corporation has an interest in the outcome of this appeal.

## Table of Contents


APPELLANT'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .......... C1 of 2

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... iii

ARGUMENT .......... 1

I. THE DISTRICT COURT ERRED BY ENHANCING HICKS'S SENTENCE UNDER THE ARMED CAREER CRIMINAL ACT. .......... 1

II. THE DISTRICT COURT ERRED IN ENHANCING HICKS'S SENTENCE UNDER THE CAREER OFFENDER GUIDELINES. .......... 6

III. THE FELON-IN-POSSESSION OFFENSE CREATED BY 18 U.S.C. §§ 922(g)(1) AND 924(a)(2) VIOLATES THE SECOND AMENDMENT ON ITS FACE. .......... 11

A. *United States v. Rahimi*, 602 U.S.__, 2024 WL 3074728 (2024) Abrogated Circuit Precedent Holding § 922(g)(1) Constitutional on its Face. .......... 11

B. The Plain Text of the Second Amendment Establishes Mr. Hicks's Right to Possess a Firearm. .......... 16

C. There Is No Founding Era Tradition of Similar Regulations for Similar Reasons. .......... 16

IV. MR. HICKS'S CONVICTION OF VIOLATING 18 U.S.C. §§ 922(g)(1) AND 924(a)(2) VIOLATES THE SECOND AMENDMENT AS APPLIED TO HIM. .......... 24

A. As Applied Arguments Are Available. .......... 24

B. No Historical Analogue Permanently Disarmed Persons On Account of Their Having Convictions Like Mr. Hicks's. .......... 27

CONCLUSION .......... 30

CERTIFICATE OF COMPLIANCE ........................................................................ 31

CERTIFICATE OF SERVICE........................................................................... 32

## Table of Authorities

## Cases


*Begay v. United States*,
553 U.S. 137 (2008) .......... 14

*Brown v. United States*,
__U.S.__, 144 S.Ct. 1195 (2024).......... 1

*Bucklew v. Precythe*,
587 U.S. 119 (2019) .......... 27

*C.W. v. Dep't of Human Services*,
353 Ga. App. 360 (2019) .......... 7, 8, 9

*Chamu v. U.S. Attorney General*,
23 F.4th 1325 (11th Cir. 2022) .......... 3

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) .......... 27

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... *passim*

*Folajtar v. Attorney General*,
980 F.3d 897 (3rd Cir. 2020) .......... 22

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) (Barret, J., dissenting) .......... 21, 27, 28, 29

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
597 U.S. 1 (2022) .......... *passim*

*Ramos v. U.S. Atty' Gen.*,
709 F.3d 1066 (11th Cir. 2023) .......... 3

*Said v. U.S. Att'y Gen.*,
28 F.4th 1328 (11th Cir. 2022) .......... 2, 4, 12

*United States v. Archer*,
531 F.3d 1347 (11th Cir. 2008) .......... 14

*United States v. Duarte*,
101 F.4th 657 (9th Cir. 2024) .......... 28

*United States v. Dubois*,
94 F.4th 1284 (11th Cir. 2024) .......... *passim*

*United States v. Eason*,
953 F.3d 1184 (11th Cir. 2020) .......... 5

*United States v. Files*,
63 F.4th 920 (11th Cir. 2023) .......... 14

*United States v. Gilbert*,
138 F.3d 1371 (1998) .......... 14

*United States v. Jackson*,
55 F.4th 846 (11th Cir. 2022) .......... 9

*United States v. Rahimi*,
602 U.S.__, 2024 WL 3074728 (2024) .......... *passim*

*United States v. Rodriguez-Gamboa*,
972 F.3d 1148 (9th Cir. 2020) .......... 3

*United States v. Rozier*,
598 F.3d 768 (11th Cir. 2010) .......... *passim*

*United States v. Taylor*,
596 U.S. 845 (2022) .......... 3

*Webster v. Fall*,
266 U.S. 507 (1925) .......... 10

**Statutes**

18 U.S.C.
§ 922(g)(1) .......... *passim*

§ 922(g)(8) ........ *passim*
§ 924(e)(2)(A)(ii) ........ 1

21 U.S.C.
§ 802(16)(A) ........ 2, 4

*An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112 (1790) ........ 29

Ga. Code Ann.
§ 15-11-2(56) ........ 8
§ 16-13-21(16) ........ 2
§ 16-13-21(4) ........ 7
§ 16-13-21 ........ 2, 7, 8

**Other Authorities**

Brief of United States, *United States v. Dubois*, 2022 WL 17317506 *18 (11th Cir. Nov. 23, 2022) ........ 24

Brief of United States, *United States v. Rahimi*, No. 22-915 (Aug. 14, 2023) .... 12

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) ........ 22

Margarita Mercado Echegaray, Note, *Drug Prohibition in America: Federal Drug Policy and its Consequences*, 75 REV. JUR. U.P.R. 1215 (2006) ........ 28

**United States Sentencing Guidelines**

U.S.S.G. §4B1.2(b) ........ 6, 7, 9

**Rules**

11th Cir. R. 26.1-1 ........ C1

11th Cir. R. 32-4 ........ 31

Fed. R. App. P. 26.1 ........ C1

Fed. R. App. P. 32 .......................................................................................... 31

**Argument**

I. THE DISTRICT COURT ERRED BY ENHANCING HICKS'S SENTENCE UNDER THE ARMED CAREER CRIMINAL ACT.

The District Court found that Mr. Hicks was an armed career criminal based on four sets of Georgia convictions involving marijuana, and one involving cocaine, with all of the convictions occurring between December 2000 and December 2012. This changed his statutory sentencing range from 0 to 10 years to 15 years to life. He argues none of these offenses qualified as serious drug offenses within the meaning of 18 U.S.C. § 924(e)(2)(A)(ii) because Georgia defined cocaine and marijuana more broadly at the time of his prior convictions than the respective federal definitions at the time of his federal sentencing. He identified three ways in which it defined cocaine overbroadly and two ways in which it defined marijuana overbroadly. Of these five overbreadths, only the marijuana stalk issue is a potentially dispositive and open question for this panel at this time.[1]

[1] Mr. Hicks's arguments that Georgia marijuana is overbroad for including hemp and Georgia cocaine is overbroad for including ioflupane are no longer viable in light of *Brown v. United States*, __U.S.__, 144 S.Ct. 1195 (2024). There, the Supreme Court held for a state offense to qualify, it must involve a controlled substance as defined by federal law *at the time of the state offense*. *Id*. at 1210. At the time of Mr. Hicks's prior convictions, the respective federal definitions included hemp and ioflupane.

While both Georgia and federal law define marijuana to include "all parts of the plant[,]" Ga. Code Ann. § 16-13-21(16); 21 U.S.C. § 802(16)(A), Georgia excepts from this definition "the completely defoliated mature stalks of such plant," § 16-13-21(16), while the federal government excludes "the mature stalks of such plant." 21 U.S.C. § 802(16)(A). The government contends that the divergent language does not create a realistic probability that Georgia criminalizes conduct that the federal government does not. Red Br. at 32. It reasons that the federal government does not separately exclude marijuana leaves from its definition, so in practice it only excludes completely defoliated stalks, like Georgia. *Id*. at 36. Finally, it distinguishes *Said v. U.S. Att'y Gen.*, 28 F.4th 1328 (11th Cir. 2022), which held that Florida defined marijuana overbroadly, on the ground that Florida does not

---

His argument that Georgia marijuana is overbroad based on including more species of cannabis than the federal definition is foreclosed in light of the 50-year old case law unearthed by the government construing the definition to include all species. Red Br. at 29-30. Mr. Hicks would argue that these cases were wrongly decided, as the opinions elevated policy and suppositions about Congressional intent over the plain language Congress used to define marijuana. Still, he acknowledges they bind this Court.

Mr. Hicks's argument that Georgia cocaine is overbroad for including conformational isomers of cocaine is unaffected by intervening law, since this overbreadth existed at the time of his prior cocaine conviction. However, he agrees with the government that this issue is not dispositive of his appeal, *see* Red Br. at 19 n4., so he rests on his prior arguments for this point.

except any stalks from its definition. *Id*. at 38 n.13. There are numerous problems with the government's reasoning.

First, the Supreme Court abrogated the realistic probability test in *United States v. Taylor*, 596 U.S. 845 (2022). It rejected the government's argument that "a defendant must present evidence about how his crime of conviction is normally committed or usually prosecuted." *Id*. at 858. The question is simply whether the divergent language in Georgia's and the federal government's respective definitions speak to a real-world difference. *Cf. United States v. Rodriguez-Gamboa*, 972 F.3d 1148, 1155 (9th Cir. 2020) (reasoning a statute that criminalized possessing dangerous animals would not be overbroad if it defined animals to include nonexistent dragons, while federal comparator did not).

Second, even if the reasonable probability test survived *Taylor*, this Court has repeatedly recognized that a defendant does not need to point to a sample prosecution to satisfy that test "when the statutory language itself" is overbroad. *See, e.g., Ramos v. U.S. Atty' Gen.*, 709 F.3d 1066, 1072 (11th Cir. 2023); *Chamu v. U.S. Attorney General*, 23 F.4th 1325, 1330 (11th Cir. 2022). Mr. Hicks thus does not need a "case on point" to satisfy the "realistic probability" test.

Third, the government does not explain why the exclusion of "mature stalks" does not fairly encompass the leaves on such stalks. It suggests that the federal

government's exception implicitly meant "defoliated" mature stalks, because marijuana "leaves" are part of the plant, and the federal definition of marijuana generally includes " 'all parts of the plant[.]' " Red Br. at 38 n.12 (quoting 21 U.S.C. § 802(16)(A)). Of course, "mature stalks" are a part of the plant as well, but these are included in the exception to the otherwise applicable "all parts of the plant" definition. The question is the scope of this exception, and that question is not answered by reference to the otherwise applicable definition that the exception applies to. To the extent there is any ambiguity in the federal exception, the rule of lenity dictates interpreting "mature stalks" to include attached leaves. Nothing in the phrase implies some additional processing of the stalks to remove the leaves. With or without leaves, they remain "mature stalks." Hence, on the most natural reading of the phrase, the mature stalks exception includes foliated stalks.

Finally, although the government tries to distinguish the case, *Said*, 28 F.4th 1328, detracts from its arguments. The Court recognized the overbreadth of Florida marijuana based on the statutory language alone, although there was no case on point showing that Florida had convicted a person based only on marijuana stalks. *Id*. at 1332-1333. It reasoned "federal law does not include the mature stalks of the marijuana plant or fiber produced from such stalks. This is a significant divergence, and on its own, is sufficient to establish a reasonable probability of broader

prosecution under Florida law." *Id*. at 1333. It concluded "our court generally does not 'ignore the statutory text and construct a narrower statute than the plain language supports.' " *Id*. (quoting *United States v. Eason*, 953 F.3d 1184, 1192 (11th Cir. 2020)).

This is exactly the sort of statutory-based overbreadth that Mr. Hicks outlines here. There is no call for this Court to add the word "defoliated" to the federal definition in order to conclude that the two definitions are the same.

## II. THE DISTRICT COURT ERRED IN ENHANCING HICKS'S SENTENCE UNDER THE CAREER OFFENDER GUIDELINES.

In *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024), this Court held that, to qualify as a controlled substance offense, a prior offense does not have to involve a drug that matches the federal definition. It also held that the relevant definition of the drug is the version in effect at the time of the prior conviction. *Dubois* thus defeats two parts of the argument Mr. Hicks made below – namely (1) that U.S.S.G. §4B1.2(b)(1), according to its own terms, requires that a predicate involve a substance defined no more broadly than the federal government, and (2) that the relevant comparator is the federal definition is in effect on the federal sentencing date, not on the date of his prior convictions. *Id.*[2]

Although *Dubois* closed these doors to Mr. Hicks, it opened another. *Dubois* held "[b]ecause Dubois's underlying conviction was under Georgia law, we consult Georgia law to determine whether the substance that he trafficked is a 'controlled substance' under the guidelines." 94 F.4th at 1297-1298. Thus, the term "controlled substance" in U.S.S.G. §4B1.2(b) means "controlled substance" as defined in Georgia. *Id*. And Georgia defines "controlled substance" as a substance appearing

---

[2] He maintains *Dubois* wrongly decided these points, in order to preserve them for further review, but acknowledges it is binding.

in *both* the federal and state drug schedules. Ga. Code Ann. § 16-13-21(4). Accordingly, if the federal government, at the time of Mr. Hicks's alleged predicate convictions, defined cocaine or marijuana to include a substance that Georgia did not, then Georgia cocaine does not categorically qualify as a "controlled substance" *under Georgia law*. And if it does not categorically qualify under Georgia law, it cannot categorically qualify as a "controlled substance" within the meaning of §4B1.2(b)(1).

Mr. Hicks's convictions were under Georgia law. Georgia defines "controlled substance" as "a drug, substance, or immediate precursor in Schedules I through V of Code Sections 16-13-25 through 16-13-29 *and* Schedules I through V of 21 C.F.R. Part 1308". Ga. Code Ann. § 16-13-21(4) (italics added). Hence, to qualify as a Georgia "controlled substance," a drug must be listed on both the federal and Georgia schedules.

Lest there be any doubt about whether the statutory word "and" really means "and," the Georgia Court of Appeals has clarified that it does. At issue in *C.W. v. Dep't of Human Services*, 353 Ga. App. 360 (2019), was whether an expectant mother's use of marijuana qualified as "prenatal abuse." Georgia law defines "prenatal abuse" as, *inter alia*, "exposure . . . to any controlled substance, as such term is defined in Code Section 16-13-21, which results in []" certain

consequences. *Id.* (quoting Ga. Code Ann. § 15-11-2(56)). The Court of Appeals reviewed Georgia's controlled substance definition, and held "[u]nder the plain language of the statute, as C.W. argues, the administrative law judge found, and [the Division of Family and Children Services] concedes – a drug is a 'controlled substance' in OCGA § 16-13-21 only if it is listed as such in both Georgia *and* federal schedules." *Id.* at 361 (italics in original.) Because only the federal schedule included marijuana as such, marijuana did not qualify as a Georgia controlled substance. *Id.*

Hence, as to Mr. Hicks's marijuana convictions, binding Georgia case law holds in no uncertain terms that marijuana is not a Georgia controlled substance. *Id*. And *Dubois* held in no uncertain terms that whether a predicate offense involves a "controlled substance" under U.S.S.G. §4B1.2 turns on whether it is a "controlled substance" under the law of the jurisdiction of the predicate offense. 94 F.4th at 1297-98. This ends the matter. This Court is bound by both Georgia's construction of its controlled substance definition to exclude marijuana, and by *Dubois*. It must hold that Georgia marijuana offenses do not involve a controlled substance and therefore cannot qualify as a "controlled substance offense."

The government argues that Georgia marijuana is a "controlled substance" under Georgia law even though Georgia statute and case law clearly hold the

contrary. It suggests that a state drug is a "controlled substance" within the meaning of §4B1.2(b) if it involves "a drug regulated by state law," even if the state does not consider it a "controlled substance." This sweeps far too broadly. States regulate all kinds of drugs and substances that they do not consider controlled substances. But recall what we are defining. Section 4B1.2(b) defines "controlled substance offense" – not some broader, or more nebulous "offense involving a drug regulated by state law." And *Dubois* concerned the definition of "controlled substance" within the meaning of the "controlled substance offense" definition.

Ironically, the fact that Georgia law specifically holds that marijuana is not a controlled substance was lost on the *Dubois* panel. A review of the briefs shows that neither party brought *C.W.* to the Court's attention. Although a Georgia marijuana predicate was at issue in *Dubois*, its ultimate conclusion that Georgia marijuana offenses qualify as "controlled substance offenses" does not bind this panel, because Mr. Hicks raises the distinct issue of whether Georgia marijuana is disqualified by virtue of its exclusion from the Georgia "controlled substance" definition. Much like the cocaine predicate issue at stake in *United States v. Jackson*, 55 F.4th 846, 852-53 (11th Cir. 2022), this was not an "overlooked argument," but rather an "unraised issue," about which this Court did not make law *sub silentio*. *Id*. at 853 (" 'Questions which merely lurk in the record, neither

brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedent.' ") (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

## III. THE FELON-IN-POSSESSION OFFENSE CREATED BY 18 U.S.C. §§ 922(g)(1) AND 924(a)(2) VIOLATES THE SECOND AMENDMENT ON ITS FACE.

### A. *United States v. Rahimi*, 602 U.S.__, 2024 WL 3074728 (2024) Abrogated Circuit Precedent Holding § 922(g)(1) Constitutional on its Face.

In his initial brief, Mr. Hicks acknowledged that *Dubois*, 94 F.4th at 1291-93, then foreclosed his facial Second Amendment argument. Blue Br. at 57. *Dubois* held that *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010) controlled Dubois's facial Second Amendment challenge to § 922(g)(1) under the prior precedent rule. *Rozier* had upheld § 922(g)(1) based on language from *District of Columbia v. Heller*, 554 U.S. 570 (2008) suggesting the Second Amendment belonged to "law-abiding citizens." It specifically found this language to be binding, and thus concluded "felons are unqualified as 'a class' because they are not law-abiding citizens." *Dubois*, 94 F.4th at 1292 (quoting *Rozier*, 958 F.3d at 770-771, 771 n.6) (internal citations omitted).

*Dubois* held that *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), had not abrogated *Rozier*, because "*Bruen*, like *Heller*, repeatedly described the right as extending only to 'law-abiding, responsible citizens.' " *Id*. at 1293. It thus reaffirmed *Rozier*, stating: "We require clearer instruction from the

Supreme Court before we may reconsider the constitutionality of section 922(g)(1)." *Id*. The Supreme Court has now provided clearer instruction in *Rahimi*, 2024 WL 3074728, and thus abrogated both *Rozier* and *Dubois*.

*Rahimi* put to bed the jurisprudential status of the Supreme Court's references to "law-abiding" individuals in *Heller* and *Bruen*. The government argued throughout *Rahimi* that, as interpreted in *Heller* and *Bruen*, "the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens." Brief of United States, *United States v. Rahimi*, No. 22-915, at 6 (Aug. 14, 2023); *see also id.* at 11; *id.* at 12. The Supreme Court "reject[ed] the government's contention that Rahimi [could] be disarmed simply because he is not 'responsible.'" *Rahimi*, at *11. It explained, although *Heller* and *Bruen* "used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right," those opinions "said nothing about the status of citizens who were not 'responsible.' " *Id.* That "question was simply not presented" those cases. *Id.*

What is true of "responsible" is equally true of "law-abiding." The Supreme Court in *Rahimi* did not specifically address the "law-abiding" adjective because the Government relied only on a (purported) government power to deny firearms to those who are not "responsible." *See Rahimi*, Brief for United

States at 27-29 (arguing § 922(g)(8) defendants are "not 'responsible' " and suggesting, by contrast, that felons and illegal immigrants are not "law-abiding"). But both "responsible" and "law-abiding" derive from the same source: *Heller*'s and *Bruen*'s use of those words to describe the challengers in those cases. And just as the "responsible" question "was simply not presented" in *Heller* or *Bruen*, those cases did not address the "law-abiding" question either. *Rahimi*, 2024 WL 3074728, at *11. In addition to finding the phrase was dicta, Rahimi affirmatively held that "responsible" is too vague a term to legitimize burdens on the Second Amendment. *Id*.

"An intervening Supreme Court decision abrogates our precedent only if the intervening decision is both 'clearly on point' and 'clearly contrary to' our earlier decision." *Dubois*, 94 F.4th at 1293 (citation omitted.) *Rahimi* specifically and clearly held that the passages in *Heller* and *Bruen*, which refer not only to "responsible" but also to "law-abiding" citizens, were dicta. This is directly contrary to the specific conclusions in *Rozier* and *Dubois* that these references were not dicta. And the holdings of *Rozier* and *Dubois* were founded on this supposedly binding constitutional principle. *Rahimi* thus abrogated these holdings.

Together, *Rahimi* and *Bruen* abrogated *Rozier* and *Dubois* in two additional ways. Methodologically, "where the Supreme Court has clearly set forth a new standard to evaluate" a legal issue, prior Circuit precedent addressing that issue "has been undermined to the point of abrogation and [this Court] is bound to follow th[e] new rule of law." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008). This understanding of abrogation was essential to the holding in *Archer* that, by announcing a new standard, *Begay v. United States*, 553 U.S. 137 (2008) had abrogated *United States v. Gilbert*, 138 F.3d 1371 (11th Cir. 1998) on the issue of whether unlawfully carrying a concealed weapon qualified as a §4B1.2 crime of violence, even though *Gilbert* specifically held that carrying a concealed weapon was a crime of violence, and in *Begay* the alleged predicate was DUI. Notwithstanding this difference, *Archer*, 531 F.3d at 1352, held that *Begay* was "clearly on point."

Likewise, *Bruen* and *Rahimi* abrogated *Rozier* by creating a new Second Amendment standard that dictates a different result than the one *Rozier* reached. *Cf. United States v. Files*, 63 F.4th 920, 928 (11th Cir. 2023) (although a legal test may not always be strictly necessary to the holding, "no one thinks that when we do state a governing rule – as we typically do – we do so gratuitously and unnecessarily.")

Substantively, *Bruen* established that the "only" bases for determining that persons are "disqualified" from firearm possession are either the plain text of the Second Amendment or the traditional, founding-era firearms regulations. *Bruen*, 597 U.S. at 24. *Rahimi*, at *6 confirmed that there are only two steps to deciding whether a regulation violates the Second Amendment: text and history.

*Rozier* read into *Heller* an additional step, divorced from text or history, that asks "whether one is qualified to possess a firearm." 598 F.3d at 770. And *Dubois* reaffirmed this additional step, again, on the ground that *Bruen* had repeated the *Heller* dicta that this Court believed dictated the step. This was not, and did not purport to be, either a textual analysis of whether felons are among "the people," or an historical analysis of whether they were traditionally barred from firearm possession. Because *Rozier* found § 922(g)(1) constitutional based on a carveout of non-law-abiding citizens that did not accord with **either** step of the *Bruen* and *Rahimi* test, *Bruen* and *Rahimi* abrogated *Rozier* and *Dubois*. Because its additional step was derived from an interpretation of *Heller* and *Bruen* that *Rahimi* flatly rejected, *Rahimi* abrogated *Rozier* and *Dubois*.

B. The Plain Text of the Second Amendment Establishes Mr. Hicks's Right to Possess a Firearm.

The government understandably relied on *Dubois* and Mr. Hicks's concession that, before *Rahimi*, *Dubois* foreclosed his facial Second Amendment challenge. It thus declined to attempt to meet its burden of showing a Founding-era tradition of "similar restrictions for similar reasons." *Rahimi*, at *6, or to make any arguments on the merits of Mr. Hicks's claims. Mr. Hicks nonetheless elaborates on his arguments in light of *Rahimi*.

As to the Second Amendment's text, *Rahimi* made clear that previous statements about "law-abiding, responsible" citizens played no role in the Second Amendment other than to describe the parties in those cases. Not only did this abrogate this Court's precedent built on that dicta, but it defeats any suggestion that these adjectives qualify who among "the people" enjoys Second Amendment rights. Rather, because the Second Amendment is an individual right, and not a civic one, it belongs even to those who have lost certain civil rights as a result of a felony conviction. Blue Br. at 64-65.

C. There Is No Founding Era Tradition of Similar Regulations for Similar Reasons.

Preliminarily*, Rahimi* clarified a number of methodological points raised in Mr. Hicks's initial brief. As to the historical scope of the inquiry, *see* Blue Br. at 69-

70, *Rahimi* first provided a general overview of the history of Anglo-American gun regulations. *Id*. at *7. It then zeroed in on the "distinct legal regimes" most relevant to 18 U.S.C. § 922(g)(8) – surety laws and "going armed" laws. *Id*. at *7 -*9. These regimes were significant because they existed "[b]y the 1700s and early 1800s[.]" *Id*. at *7. Hence, although *Rahimi* explored the roots of these traditions that go back to well before the Founding generation, such a deep historical dive was only relevant to the extent it illuminated regulatory traditions that were still widely prevalent during the Founding era. *Rahimi* thus confirms that the dispositive historical period is the " 'period immediately before and after the framing of the Constitution.' " *Bruen*, 597 U.S. at 34 (citation omitted).

Next, *Rahimi* ignored the "distinctly similar" test outlined in *Bruen*, without overruling it. *See* Blue Br. at 66-69. It simply applied the "relevantly similar" test, without considering the novelty of the problem § 922(g)(8) was designed to address. Presumably, therefore, to validate § 922(g)(1), an historical tradition need only be "relevantly similar." But even under this slightly more capacious standard, "[w]hy and how the regulation burdens the right are central to this inquiry." *Rahimi*, at *6.

Finally, *Rahimi* clarified how prevalent a regulatory tradition must be to constitutionalize a contemporary regulation. *See* Blue Br. at 71-72. Recall that

"three colonial regulations," *Bruen*, 597 U.S. at 17, and "a single law, in effect in a single city," *Heller*, 554 U.S. at 632, are woefully inadequate. The surety laws relied upon by *Rahimi*, in contrast, were "well entrenched in the common law" during the Founding era, and the "going armed" laws were on the books in 10 founding-era jurisdictions and applied at common law in others. *Id*. at *7-*9.

*Rahimi* provides several substantive benchmarks as well. "[D]isarm[ing] political opponents" is out as a relevant tradition, *id*. at *7, while restricting the firearm rights of those "found to pose a credible threat to the physical safety of others" is in. *Id*. at *10. And the limited duration of disarmament is crucial to determining whether § 922(g)(8) involved a similar "how" to the relevant historical traditions. *Id*.

In the wake of *Rahimi*'s clarifications of the *Bruen* methodology, the government still cannot show a Founding-era regulatory tradition that imposed a burden on the Second Amendment comparable to permanent disarmament for reasons similar to those motivating § 922(g)(1). The historical traditions recognized in *Rahimi* do not constitutionalize § 922(g)(1) the way they constitutionalized § 922(g)(8), because he felon-in-possession ban does not share the same commonalties with the surety and going armed laws. *Rahimi* stressed that § 922(g)(8) only "applies to individuals found to threaten the physical safety of

another." *Id*. at *9. This "matche[d] the surety and going armed laws, which involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id*. In contrast, a felony conviction does not represent such a determination. Most felonies are non-violent, and many violent felonies do not involve "threaten[ing] another with a weapon." *Id*. Section 922(g)(1) therefore is not a "similar restriction" to the surety and going armed laws in this way.

*Rahimi* also emphasized that "like surety bonds of limited duration, Section 922(g)(8)'s restriction was temporary as applied to Rahimi," whose restraining order expired "one to two years after his release from prison[.]" *Id*. at *10. That is plainly untrue of § 922(g)(1) which imposes a lifetime ban on felons possessing firearms.

Nor is any other historical tradition sufficiently similar to permanently disarming convicted felons. The government has not uncovered an historical tradition motivated by "similar reasons" to those that motivated § 922(g)(1). Again, *Rahimi* foreclosed disarming persons on the ground they are deemed not "law-abiding" or "responsible." For similar reasons, *Rahimi* counsels against legitimizing gun regulations justified by the abstract label of a person as unvirtuous or dangerous.

The term "dangerous" is synonymous with the term "responsible" as used by the government in *Rahimi*. It argued there was an historical tradition of disarming those who are not "responsible," by which it meant anyone who "would endanger himself or others." *Rahimi*, Brief for United States at 29; *see also id.* ("Because persons who are subject to domestic-violence protective orders pose an obvious *danger* to others, they are not '*responsible*' individuals.") (emphasis added). It was *this* argument—i.e., dangerousness equals irresponsibility, which justifies disarmament—that the Supreme Court "reject[ed]" in *Rahimi*. 2024 WL 3074728, at *11. It follows that the government cannot defend § 922(g)(1) by invoking a purported tradition of disarming the "dangerous."

Moreover, terms like "unvirtuous" and "dangerous" are just as vague as "responsible." *Id.* Whether a particular person's felony record renders him unvirtuous or dangerous is anyone's guess. As in *Rahimi*, it is "unclear what such a rule would entail." *Id.*

In a concurrence in *Rahimi*, Justice Barrett warned against defining a historical tradition of firearms regulation too abstractly. Courts, she wrote, "must be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* at *30 (Barrett, J., concurring). Justice Gorsuch made

the same point, warning that courts should not "try[] to glean from historic exceptions overarching 'policies,' 'purposes,' or 'values' to guide them in future cases." *Id.* at *15 (Gorsuch, J., concurring) (citation omitted). Nor should courts "extrapolate from the Constitution's text and history 'the values behind that right, and then . . . enforce its guarantees only to the extent they serve (in the courts' views) those underlying values.'" *Id.* (citation omitted). Rather, courts "must proceed with care in making comparisons to historic firearms regulations, or else they risk gaming away an individual right the people expressly preserved for themselves in the Constitution's text." *Id.*

As well, the government cannot point to a Founding-era tradition with a similar "how" to § 922(g)(1). It has not at any time, in any case, before any court at any level, identified *any* Founding-era analogue disarming anyone *for life*.

The closest it can come is noting that disarmament was a collateral consequence to Founding-era sentences of death, estate forfeiture, or life imprisonment. But this analogy does not fit. First, many defendants whose offense was punishable by death or life imprisonment, did not receive that punishment. *See Kanter v. Barr*, 919 F.3d 437, 459, 461 (7th Cir. 2019) (Barret, J., dissenting) (by ratification, death penalty "no longer inevitably followed a felony conviction," and "civil death applied exclusively to life sentenced and only

if authorized by statute – and even then, it was more modest than the ancient version because the convict retained some rights.")

Moreover, at the Founding these sentences did not turn on the "felon" label. And even if they had, "felon" then bears little resemblance to the expansive contemporary scope of "felon." *Folajtar v. Attorney General*, 980 F.3d 897, 904 (3rd Cir. 2020) ("A felony unquestionably encompasses a broader array of crimes today than it did in 1791.") Modern criminal codes encompass countless obscure, and seemingly petty, felonies, such as " 'shoplift[ing] three times in seven years [in West Virginia] . . . twice operat[ing] a recording device in a movie theater in [Utah] . . . [or] release[ing] a dozen heart-shaped ballons [as] a romantic gesture [in Florida]." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 264 (2020)). Determining an individual's Second Amendment rights based on "the maximum authorized penalty" would defy *Bruen*'s second step. It would substitute a blunt, ahistorical factor for legitimate historical analysis.

Thus, even if this Court were to entertain this sort of analogue, it suffers from a different "how" problem. Disarmament as a collateral consequence of severe sentences applied to a much narrower subset of people than modern

"felons." Permanently disarming the broad category of modern felons is thus not a "comparable burden" to any Founding-era regulatory tradition.

Of course, *Rahimi*, at *6, reminded us that to prevail on a facial constitutional challenge, Mr. Hicks must show that § 922(g)(1) can apply constitutionally under no circumstances. Mr. Hicks makes that showing here. Again, assuming that permanent disarmament as a collateral consequence of founding-era sentences established a relevant legal tradition, this collateral consequence did not automatically result from the felon status like § 922(g)(1)'s bar. It turned on the sentence actually imposed on a sub-set of felons. And even with respect to convictions – such as first degree murder – for which we could presume a person would have been actually executed or sentenced to life in 1791, it is not a person's actual sentence, but their felon status alone, that triggers § 922(g)(1). Section 922(g)(1) disarms no one based on a status comparable to "having a conviction that was actually punished by death or life in 1791." And without a founding-era tradition that is relevantly similar to permanently disarming modern "felons," § 922(g)(1) cannot constitutionally apply to anyone.

## IV. MR. HICKS'S CONVICTION OF VIOLATING 18 U.S.C. §§ 922(g)(1) AND 924(a)(2) VIOLATES THE SECOND AMENDMENT AS APPLIED TO HIM.

### A. As Applied Arguments Are Available.

Neither *Dubois*, 94 F.4th 1284, nor *Rozier*, 598 F.3d 768, foreclosed successful as applied challenges to the Second Amendment. In his opening brief, Mr. Dubois challenged only the facial constitutionality of 18 U.S.C. § 922(g)(1). This is how the government understood his argument. *See* Brief of United States, *United States v. Dubois*, 2022 WL 17317506 *18 (11th Cir. Nov. 23, 2022). And nothing in the *Dubois* decision suggests the panel went beyond the parties' issues and made law on an as-applied challenge that was not before it. Likewise, the issue in *Rozier* was whether § 922(g)(1) was facially unconstitutional. Nothing in the language of that opinion addresses, let alone bars, as-applied Second Amendment challenges.

*Rahimi* strongly implied that as-applied challenges under the Second Amendment are available to defendants like Mr. Hicks. At issue was a facial challenge to § 922(g)(8), but the Court repeatedly couched its holding and analysis in language leaving open as applied challenges on different facts. *Rahimi* at *5 ("As applied to the facts of this case, Section 922(g)(8) fits comfortably within this tradition."); *id*. at *6 (explaining that to defeat a facial challenge, "the Government need only demonstrate that Section 922(g)(8) is constitutional in some of its

applications[]" and concluding "here the provision is constitutional as applied to the facts of Rahimi's own case."); *id*. at *10 ("like surety bonds of limited duration, Section 922(g)(*)'s restriction was temporary as applied to Rahimi."); id. at *11 ("in holding that Section 922(g)(8) is constitutional as applied to Rahimi, we reject the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.' "); *id*. at *16 (Gorsuch, J., concurring) ("Our resolution of Mr. Rahimi's facial challenge to § 922(g)(8) necessarily leaves open the question whether the statute might be unconstitutional as applied in 'particular circumstances.' "). This Court must therefore make a *de novo* determination of whether § 922(g)(1) is unconstitutional as applied to Mr. Hicks.

For its part, the government does not contend that this Court's precedents foreclose as-applied challenges. Instead, it argues that this Court should find in the first instance that such challenges are not available.

First, it contends there is no justification for looking past the "felony" label, noting that the Supreme Court has "traditionally focused on the 'maximum authorized penalty' " in interpreting other constitutional provisions that delineate types of crimes. Red Br. at 45-46 (citation omitted). But the Court has established a text-and-history Second Amendment framework that it has not applied to these other provisions. *Rahimi*'s careful and narrow application of the *Bruen* test to

§ 922(g)(8) shows that the Second Amendment requires a more discerning analysis than using the expedient of the "maximum authorized penalty" to legitimize a disarmament law. Perhaps the government's measure would do if contemporary criminal laws more closely resembled those that existed at the Founding. But as explained above, they do not, and the felony label in particular has changed dramatically.

The government also reminds us of Congress's prerogative to "determine[] the consequences of criminal convictions[.]" Red Br. at 46-47. But it should go without saying that Congress cannot color outside of its constitutional limits. And it is the Judiciary's prerogative to faithfully apply the Bill of Rights to the laws passed by Congress. *Cf*. *Heller*, 554 U.S. at 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.")

The government briefly points out that as applied challenges would treat the right to bear arms differently than other rights that a person may lose based on a felony conviction – the right to vote, serve on juries, and hold public office. But this difference is based on the nature of those rights. Red Br. at 47. The rights the government cites are all "civic rights" that " 'require[] citizens to act in a collective

manner for distinctly public purposes.' " *Kanter*, 919 F.3d at 462 (citation omitted). In contrast, the right to bear arms is an individual right, unconnected to a collective, civic enterprise like militia service. *Heller*, 554 U.S. at 595. This was the crux of *Heller*'s holding.

The government finally argues that "a regime of as-applied challenges to § 922(g)(1) would pose serious problems of judicial administration[,]" faulting Hicks for "fail[ing] to offer a workable test" for such challenges. Red Br. at 46-47. But the Supreme Court prescribed a workable test in *Bruen*. The distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). "[I]t does not speak at all to the substantive rule of law necessary to establish a constitutional violation," and therefore the same substantive constitutional analysis applies. *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019).

### B. No Historical Analogue Permanently Disarmed Persons On Account of Their Having Convictions Like Mr. Hicks's.

Although it does not contend that binding precedent forecloses Mr. Hicks's as applied challenge, the government makes no argument on the merits. It therefore does not attempt to satisfy its burden of showing a Founding-era tradition of "similar restrictions for similar reasons." *Rahimi*, at *6; *Bruen*, 597 U.S.

at 16. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id*. at 25, n. 6. They "are not obliged to sift the historical materials for evidence to sustain [a] statute. *Id.* at 60. If "history [is] ambiguous at best," the statute is unconstitutional. *Id.* at 39-40. Mr. Hicks in no way waives reliance on the government's burden.

He nonetheless notes that all but two of his criminal convictions were drug-related. R38 (PSR) at ¶¶ 31, 33, 34, 35, 36. "Criminalizing drug possession, in particular, did not appear to gain significant momentum until the early 20th century, with the passage of such laws as the Food and Drug Act of 1906 and the Harrison Narcotics Tax Act of 1913." *United States v. Duarte*, 101 F.4th 657, 691, n.16 (9th Cir. 2024) (quoting Margarita Mercado Echegaray, Note, *Drug Prohibition in America: Federal Drug Policy and its Consequences*, 75 REV. JUR. U.P.R. 1215, 1219 (2006)). "Before then, what we now think of as 'illicit drugs,' such as opium and cocaine, 'were . . . legal in the United States' for a long stretch of this country's history." *Id*.

Hence, whatever danger they may impose, drug crimes are not the sorts of offenses that the Ninth Circuit in *Duarte*, and then-Judge Barrett in *Kanter*, surmised might find a relevant analogue in historical precedents disarming the "dangerous." *Duarte*, 101 F.4th at 689-90 (suggesting that " 'the 18th- and 19th-

century' laws traditionally punishing certain felonies with death, estate forfeiture, or a life were "of a kind the Founding generation thought serious enough to warrant the permanent loss of the offender's Second Amendment right[]" and might share with "new-age offenses" enough " 'relevant[] similar[ities]' to justify permanent disarmament."); *Kanter*, 919 F.3d at 464 (opining "[o]ur precedent is consistent with" the principle "that the state can take the right to bear arms away from a category of people that it deems dangerous.")

That leaves only Mr. Hicks's misdemeanor conviction for simple battery. In 1791, the federal government did not punish anything resembling simple battery with death. *Cf. An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112 (1790) (making punishable by death treason, misprision of treason, murder, robbery, piracy, manslaughter on the high seas, counterfeiting, interference with diplomatic immunity, passport fraud, and some forms of accessory liability to some of these offenses). The government has not shown a relevant legal tradition suggesting that permanent disarmament was ever a direct or collateral consequence of such an offense. It therefore has not met its burden.

## Conclusion

Since he is imprisoned for conduct that the Government did not have the power to proscribe, this Court should reverse and vacate Hicks's conviction and sentence and order his immediate release. In the alternative, it should remand for resentencing without the ACCA and career offender enhancements.

Dated this 8th day of July, 2024.

Respectfully submitted,

*s /Jonathan R. Dodson*

JONATHAN R. DODSON
FL Bar Number: 0050177
Assistant Federal Defender

Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel: (478) 743-4747
Fax: (478) 207-3419
E-mail: jonathan_dodson@fd.org

## Certificate of Compliance

Pursuant to Fed. R. App. P. 32(a)(7)(C), I, Jonathan Dodson, appellate counsel for Hicks, hereby certify that the number of words in this brief, as counted by the Microsoft Office Word processing system, according to the method described in 11th Cir. R. 32-4, is **6,138**, which is less than the 6,500 allowed for appellate initial briefs by Fed. R. App. P. 32(a)(7)(B)(ii).

**Certificate of Service**

I, Jonathan Dodson, appellate counsel of record for the Appellant Hicks, hereby certify that I have, on this 8th day of July, 2024, filed the foregoing *Appellant's Reply Brief* with the Clerk of Court using the Eleventh Circuit's CM/ECF system, which will send electronic notification of filing to counsel of record. I also certify that I caused a copy of the foregoing *Appellant's Reply Brief* to be served in paper format to Hicks by placing a copy of the same in the United States Mail, postage prepaid, addressed to: Tomario Ricardo Hicks, 16708-510, FCI Jesup, 2680 301 South, Jesup, Georgia 31599. I further certify that I caused the foregoing submission to be dispatched for filing with the Clerk of Court by Federal Express overnight delivery.

*s/ Jonathan Dodson*

JONATHAN R. DODSON
FL Bar Number: 0050177
Assistant Federal Defender

Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel: (478) 743-4747
Fax: (478) 207-3419
E-mail: jonathan_dodson@fd.org